IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASPER BAILEY, G-60744, ) <br> ) <br> Petitioner, ) <br> ) <br> vs. ) <br> ) <br> RALPH DIAZ, Acting Warden, ) <br> ) <br> Respondent. ) <br> ) | No. C 12-1414 CRB (PR) <br><br> ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS |

Petitioner, a state prisoner at California Substance Abuse Treatment Facility, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence from Santa Clara County Superior Court. For the reasons that follow, the petition will be denied.

**STATEMENT OF THE CASE**

On February 11, 2009, petitioner was convicted by a jury of two counts of rape and one count of aggravated sexual assault of a child under 14. The victim was petitioner's daughter. The court sentenced petitioner to 15 years to life in state prison, with consecutive terms of six years for each of the rapes.

On October 12, 2010, the California Court of Appeal affirmed the judgment of the trial court and on December 21, 2010, the Supreme Court of

California denied review. The California courts also denied petitioner's requests for collateral relief.

On March 20, 2012, petitioner filed the instant federal petition for a writ of habeas corpus under § 2254. After petitioner withdrew several unexhausted claims, the court on February 22, 2013 found that the petition, liberally construed, stated cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

## STATEMENT OF FACTS

The California Court of Appeal summarized the facts of the case as follows:

> II. PROCEDURAL BACKGROUND
>
> The information contained three counts: counts 1 and 2 alleged aggravated sexual assault of a child under the age of 14 and count 3 alleged rape by means of force, violence, duress, menace, or fear. Trial commenced on January 22, 2009. The principle disputes at trial concerned the overall truth of daughter's allegations, how many assaults had actually occurred, and, if there had been three assaults, whether the first two had occurred prior to daughter's 14th birthday. . . .
>
> . . .
>
> III. The Evidence at Trial
> 1. Daughter
>
> Daughter was born in Africa in July 1992. She lived in refugee camps in Liberia and the Ivory Coast with defendant, her mother, her brother, and stepdaughter. Daughter was 11 years old when she and defendant immigrated to the United States, settling in San Jose where they lived in a one-bedroom apartment. Stepdaughter had immigrated around the same time, settling in North Dakota. Daughter's mother and brother had not been permitted to leave Africa when defendant and daughter left and so they stayed behind.
>
> Daughter had had no schooling in Africa other than a year of kindergarten. Her first language was not English but one of the traditional languages of Africa. She was placed in the fifth grade in San Jose but struggled so much that she repeated her fifth grade year. Defendant was very critical of the problems daughter had at school. He called her stupid, and insisted her problems were behavioral only. He was very strict with her. He struck her as often as twice a day, usually with a belt to the hand. Daughter complained to school personnel of defendant's abuse and she

2

was taken into protective custody twice but both times she was returned to defendant's care.

Daughter judged the timing of past events based upon her grade in school. Daughter was 11 and 12 years old during her two fifth grade years, 13 when she was in the sixth grade, and 14 when she was in seventh grade. During her fifth and sixth grade years, daughter lived with defendant in a one bedroom apartment on Sixth Street. When she was in the seventh grade they lived in a similar apartment on Seventh Street.

Daughter testified that when she was in the sixth grade, defendant came to her after she had gone to bed for the night and woke her up by taking off her pajamas. He then lay down on top of her. Daughter struggled but he held her hands and covered her mouth with his arm and put his penis into her vagina. She felt something wet, then he got up. He told her that if she told anyone, he would beat her and send her back to Africa.

The prosecutor asked daughter how many times defendant had forced her to have sex with him and she replied, "Two." The prosecutor asked her what grade she was in the next time he forced her to have sex with him and she said she was in the sixth grade and that it was in the same month as the first time but that it occurred while they were living on Seventh Street. The same thing happened as happened the month before. Defendant came to her bed, removed her pajamas, and raped her. In the morning, daughter told defendant that she was going to tell someone about what he had done but he told her that if she did so, he would hit her and send her back to Africa to live with his father. Daughter denied having had sex prior to defendant's raping her.

The prosecutor then asked daughter if there had been a third incident, to which daughter replied that there was. It occurred in the summer when she was 15 years old. She had been sitting on the couch in the living room and defendant came to her, touched her shoulder, and told her that the reason he raped her was because her mother was not there and because of daughter he could not have any girlfriends. He then took her pants off, took his pants off, and placed his penis in her vagina. Later that evening he again told her that if she told anyone he would send her back to Africa.

On or about July 16, 2008, shortly before her 16th birthday, daughter went to the Oakland home of M.W., defendant's former girlfriend. M.W. was going to braid daughter's hair as a treat for her 16th birthday. The braiding took most of the afternoon. Toward evening, defendant called M.W. and told her to have daughter walk down to the bus stop to meet him. M.W. refused because it was getting dark by then so defendant was obliged to come to the house to fetch daughter. Defendant arrived in a rush, abruptly ordering daughter to leave with him. There were boys at the house and defendant did not like daughter talking to boys. He was angry and told her he was going to hit her when they got home. Daughter said she was not going home and he grabbed her and pulled her outside. Daughter resisted but defendant dragged her by the arm, then by the leg, and then by the hair. Daughter screamed and struggled and tried to keep her balance; she fell and scraped up her thumb. She yelled at defendant, telling him she

3

hated him and that he was not her dad anymore. Daughter cried out, "I'm tired of him trying to sleep with me." Her friend F.W. and some others had come out and pulled daughter inside the front gate, locking defendant out. Someone called the police.

In the ensuing days, daughter told her story to at least three investigating police officers. In two formal interviews, she stated that defendant had raped her three times. At the preliminary hearing, however, she said it had happened only twice. She admitted that her testimony at the preliminary hearing had been a lie. She lied, she said, because she had thought that if the abuse had happened only twice defendant would not have to go to jail. She believed that if defendant went to jail, her mother would not be able to come to the United States. That was because defendant told her that he was the one "fixing her [mother's] paperwork to come here."

### 2. F.W.

F.W. testified that defendant was rough with daughter when he came to pick her up at M.W.'s house and that he was hitting her, which was why she and her friends pulled daughter away from him and back into M.W.'s apartment. That was when daughter told F.W., "my dad [ sic ] been sleeping with me." Daughter had told F.W. the same thing during a telephone conversation in the past but she made F.W. promise not to tell anyone. This time, F.W. told daughter that if the police came, daughter should tell them. Daughter at first was reluctant, she did not want defendant to get in trouble, but F.W. persisted.

### 3. Police Investigators

Daughter told the story of defendant sexually molesting her to Oakland Police Officer Doria Neff, who was one of the officers responding to the call at M.W.'s house on July 16, 2008. Officer Neff had heard one of the bystanders tell daughter, "You need to tell the police." Officer Neff walked daughter down to the end of the driveway and daughter told her that defendant was having sex with her. There was a question about jurisdiction since Officer Neff was with the Oakland police and the alleged crimes had occurred in San Jose. Consequently, daughter spent three hours in the back of a police cruiser waiting for someone to decide who should conduct a formal interview. During those three hours, Officer Neff had several informal talks with daughter about her allegations. Daughter told the officer that the sexual assaults first started two weeks after her 14th birthday, they happened at night after she had gone to sleep, they occurred once a month, and the only act was defendant putting his penis in her vagina; there was no kissing or other sexual activity. Daughter seemed inexperienced in the area of sexual relations and Officer Neff spent some time teaching her the names of the body parts.

Oakland Police Officer Herbert Webber conducted a recorded interview with daughter later that morning. Daughter told Officer Webber that there had been three separate assaults. He asked her how old she was when the sexual abuse first began and she said, "Since I was like 14." At some point she said she was 11 but then corrected herself and said, no, "I think I was 14." Officer Webber did not try to get daughter to correlate the incidents with where she was in school or in which apartment she was

4

living at the time each incident occurred. Daughter described penile-vaginal intercourse, no other sexual contact. The third assault had occurred, she said, just days before the argument at M.W.'s house in Oakland. The first two assaults occurred sometime earlier, about a week to a month apart. She also said that defendant had threatened to send her back to Africa if she told anyone.

Jeremy Martinez, a detective with the San Jose Police Department, interviewed daughter about two weeks later, on July 29, 2008. She told Detective Martinez that she had come to San Jose in 2004, she went straight into the fifth grade, and was 14 or 15 at that time. The detective walked her through the dates and years in school to straighten out the age she was when in the fifth, sixth, and seventh grades. She then told him that that the first time defendant had sexually abused her was when she was in the sixth grade. A second incident occurred while she was still in the sixth grade. These two incidents were similar; defendant came to her in her bed, took her clothes off, and had forcible penile-vaginal intercourse. A third incident occurred just about a week before she went to Oakland to have her hair braided. As daughter described the sex acts to Officer Martinez she kept her eyes downcast and spoke in a very low voice. She appeared ashamed.

### 4. Leslie Salmon

Leslie Salmon, a social worker with the Santa Clara County Department of Family and Children Services, investigated daughter's allegations. On July 18, 2008, two days after the Oakland incident, Ms. Salmon conducted a telephone interview with stepdaughter, who was still in North Dakota. She told stepdaughter of daughter's allegation that defendant had raped her and asked stepdaughter if she thought the allegation could be true. Stepdaughter said "yes, because he did the same thing to me when I was [daughter's] age." Stepdaughter went on to describe the prior conduct to Ms. Salmon.

### 5. Mary Ritter

Physician's Assistant Mary Ritter performed a sexual assault examination of daughter which revealed that the posterior portion of the hymenal ring was very narrow. This, Ms. Ritter stated, is always an abnormal finding in children; it is not seen "unless there's a penetrating injury."

### 6. Stepdaughter (Evidence Code Section 1108)

Stepdaughter, who was 24 years old at the time of trial, testified that when she was 17 years old and still living in Africa, defendant had raped her. The rape occurred when the rest of the family was traveling and stepdaughter and defendant were left alone at home. It was the first time stepdaughter had been alone with defendant. One night, defendant came to her while she was asleep and started touching her. She woke up and asked him what he was looking for. He said he was just trying to find something and left. The next night, he came in again. This time he removed her pants and bra, got on top of her, and put his penis into her vagina. Stepdaughter screamed and yelled and tried to fight him off but he did not stop. The neighbors came and knocked on the door, whereupon defendant ran out and did not return until the next day. Stepdaughter went

5

>to the police station and reported the incident but nothing was done. Stepdaughter promptly moved out of the house and moved in with her aunt. She told her mother what had happened. She did not tell daughter.
>
>### 7. The Defense Case
>
>Defendant introduced the testimony of several character witnesses. Registered Nurse Cari Caruso took issue with Ms. Ritter's opinion of the findings on daughter's sexual assault examination. And defendant testified on his own behalf. Defendant stated that he did not engage in the acts alleged by daughter or stepdaughter. Indeed, he maintained that M.W., F.W., Leslie Salmon, and other witnesses for the prosecution had lied as well.

People v. Bailey, 2010 WL 3965924 *1-5 (Cal. App. 6 Dist., Oct. 12, 2010).

## DISCUSSION

A.  Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct

6

governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, which applies to the final four claims petitioner raises here, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable

application of clearly established federal law. Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

B. Claims

Petitioner raises seven claims for relief under § 2254: (1) erroneous exclusion of evidence; (2) erroneous jury instruction; (3) erroneous admission of prior uncharged conduct; (4) ineffective assistance of trial counsel; (5) evidence was manipulated by prosecution and insufficient to sustain the conviction; (6) police officer misconduct while investigating the case; and (7) a witness lied while testifying and coached the victim. The claims are without merit.

1. Exclusion of Evidence

Petitioner first argues that the trial court erred in excluding evidence that the victim described the sexual assault in conflicting terms when she spoke to her counselor, Ms. Traub, the night before her testimony.

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683 690 (1986)); see California v. Trombetta, 467 U.S. 479, 485 (1984) (due process); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) (compulsory process). The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses. See Washington v. Texas, 388 U.S. 14, 19 (1967). But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." Id. at 16. Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to

the purposes [the exclusionary rule applied is] designed to serve." Holmes, 547 U.S. at 324 (internal citation and quotation marks omitted); Michigan v. Lucas, 500 U.S. 145, 151 (1991).

The California Court of Appeal summarized the facts below:

> Between the time of the Oakland incident and the time of trial, [the victim] had recounted her story of the assaults a number of times. Her retelling of the incidents was not entirely consistent. In particular, she told Detective Martinez that there were three incidents but had testified at the preliminary hearing that there were only two. The prosecutor gave transcripts of the Martinez interview and the preliminary hearing to [the victim's] foster mother to review with [the victim] in advance of her testimony at trial the next day. The point of the review was to prepare daughter for questions about the discrepancy. The following day, Ms. Traub, who had been present when the foster mother reviewed the transcripts with daughter, told the prosecutor that during the review [the victim] had made some inconsistent comments pertaining to when or whether there had been a third incident. Ms. Traub told the prosecutor: "[W]e just left it"; there had been "no resolution, two times, three times, couch or whatever." In camera, Ms. Traub testified that [the victim] had "stated it happened twice in sixth grade and did not happen in eighth grade." She said [the victim] then stated, "it might have happened in eighth" and that [the victim] had "appeared to be very confused." "[S]he was very inconsistent, changed several times, and there was no outcome to it."
>
> Defendant wanted to call Ms. Traub as a witness. Ms. Traub believed that, because she was a counselor, her conversation was privileged. All counsel agreed that there was no privilege given the circumstances but the trial court was concerned about the effect Ms. Traub's testimony might have upon her relationship with [the victim]. The trial court stated, "My issue is that even if the statements may not be privileged, it does destroy the relationship of the psychotherapist-patient." The court intended to "balance the interest served by the psychotherapist-patient relationship against the ... defendant's right to a fair trial." The court decided to proceed on a question-by-question basis and allowed the defense to explore the issue with [the victim] in whatever depth counsel chose to explore it. The court tentatively decided that Ms. Traub would not be allowed to testify but that the foster mother could be called.
>
> In his cross-examination of [the victim], defendant's attorney asked her about reviewing the transcripts with Ms. Traub and the foster mother. [The victim] forgot whether she had told the women the assaults had happened twice in the sixth grade. She did recall telling one of them that she had not been raped in the eighth grade. Thereafter, the trial court concluded that [the victim's] response to

> cross-examination gave the defense the same evidence counsel had intended to elicit from Ms. Traub and, therefore, excluded Ms. Traub's testimony because it was "no longer relevant."

Bailey, 2010 WL 3965924 *5.

The state court denied this claim citing to state law and noted that petitioner was also not precluded from presenting a defense in violation of Chamber v. Mississippi, 410 U.S. 284 (1973). The state court noted that petitioner was allowed to illicit the testimony from the victim, that he wished to obtain from Ms. Traub. It was also noted that petitioner was allowed to explore the inconsistencies with the victim's story when she testified. Petitioner was also allowed the opportunity to call the foster mother as a witness, who witnessed the inconsistencies in the victim's recounting, yet petitioner chose not to call her.

The state court opinion was not an unreasonable application of Chambers and petitioner has failed to identify any error. The evidence that petitioner wished to illicit regarding the inconsistencies was heard by the jury during the victim's cross examination. Reporter's Transcript ("RT"), Vol. 4 at 545-50. The inconsistencies were also discussed by petitioner's counsel in closing argument. RT, Vol. 9 at 1564-65. Thus, the trial court's decision was not arbitrary or disproportionate to the purpose of maintaining the relationship between the victim and her counselor. There was no constitutional violation by preventing petitioner from calling a second witness to repeat the same testimony.

2. <u>Jury Instructions</u>

Petitioner next argues that the trial court erred in issuing the jury with CALCRIM No. 207 that states, "It is alleged that the crime occurred on or about or between certain dates. The People are not required to prove that the crime took place exactly on that day, but it that it happened reasonably close to that day." Petitioner argued that the instruction could have confused the jury into thinking

10

that a date "reasonably close" to the victim's 14th birthday would suffice to prove defendant was guilty of violating section 269 (rape of a child under the age of 14), whether the date of the incident fell before or after the day daughter turned 14.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction. See Duckett v. Godinez, 67 F.3d 734, 744 (9th Cir. 1995) (citing Estelle, 502 U.S. at 71-72).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'")

The California Court of Appeal denied this claim:

> As to count 3, [the victim] had described the rape as having occurred a week or so before the Oakland incident. CALCRIM No. 207 assured the jury that it was not necessary for the prosecution to prove the exact date upon which that crime occurred. The same is true as to counts 1 and 2, which were alleged to have occurred "on or about and between July 20, 2004 and July 19, 2006." Again, since there were no specific dates [the victim] could identify as the dates upon which the first and second rapes occurred, CALCRIM No. 207 assured the jury that it was not necessary for the prosecution to prove an exact date. But as defendant points out, the prosecution still had to prove that these two crimes occurred before [the victim's] 14th birthday, which was July 28, 2006. The jury was correctly instructed on that point. The trial court told the jury that in order to find defendant guilty of violating section 269 as alleged in counts 1 and 2, it had to find that "when the defendant acted the other person was under the age of

11

> 14 years." The trial court also explained, "Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun." No reasonable jury would have been confused by this. Read as a whole, the instructions told the jury that defendant could be guilty of violating section 269 only if [the victim] had been under the age of 14 at the time of the rape but that it was not necessary that the prosecution prove the exact date, so long as daughter had not yet turned 15. Indeed, in finding defendant guilty of violating section 269 only as to count 1, and not as to count 2, the jury demonstrated that it understood the necessity of finding that daughter was under the age of 14 at the time.

Bailey, 2010 WL 3965924 *7.

As noted by the California Court of Appeal, the jury was specifically provided with the proper instructions to find petitioner guilty of raping someone under the age of 14. Based on the verdict, the jury concluded that not all the incidents occurred when the victim under the age of 14. Clerk's Transcript ("CT") at 259-61. Thus, the jury properly applied the jury instruction to the evidence. Not only has petitioner failed to show any error, he cannot show instruction by itself so infected the entire trial that the resulting conviction violates due process. This claim is denied.

      3.      <u>Admission of Prior Uncharged Conduct</u>

Petitioner alleges that the trial court erred by allowing the admission of propensity evidence of petitioner's prior uncharged conduct, the rape of his stepdaughter while they still lived in Africa.

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. <u>Estelle v. McGuire</u>, 502 U.S. 62, 75 n. 5 (1991). Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866-67 (9th Cir. 2006); see, e.g., <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1066 (9th Cir. 2008) (because

Supreme Court expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law).

The Ninth Circuit has held that Federal Rule of Evidence 414, which allows evidence of prior sexual offenses to show a propensity to commit the charged sexual offense in federal criminal cases, does not violate due process because the evidence is still subject to the trial court's balancing test which provides for meaningful review. United States v. LeMay, 260 F.3d 1018, 1031 (9th Cir. 2001).[1]

The state court denied this claim citing state law. To the extent petitioner argues there was a violation of state law, any such claims fails. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). As the Supreme Court has not ruled on this issue, the state court decision cannot be AEDPA unreasonable and propensity evidence is allowed under the Federal Rules of Evidence. After reviewing the testimony and the decision of the state courts in admitting this evidence, this court finds no error in the admission of the evidence and the claim is denied.

///

///

///

---

[1] Federal Rule of Evidence 414 changed the general rule of evidence which disallows admission of a defendant's prior crimes or acts to prove character and makes such evidence admissible with respect to child molestation cases.

13

### 4. Ineffective Assistance of Counsel[2]

Petitioner claims ineffective of counsel on the ground that trial counsel failed to properly investigate the case and prepare for trial.

The Sixth Amendment guarantees the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, petitioner must demonstrate that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "counsel's deficient performance prejudiced the defense." Id. at 687-88. Concerning the first element, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Hence, "judicial scrutiny of counsel's performance must be highly deferential." Id. To fulfill the second element, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Id.

For a federal court reviewing a habeas petition brought by a state prisoner, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below Strickland's standard." Richter v. Harrington, 131 S. Ct. 770, 785 (2011). "The standards created by Strickland and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so." Id. at 788. The court must ask not "whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

---

[2] The final four claims were not denied with reasoned decisions by the state court, therefore this court has independently reviewed the record for each claim. Delgado, 223 F.3d at 982.

14

Petitioner asserts that he provided trial counsel with a list of fifty people to be contacted. Petitioner states that trial counsel only contacted eight people and did not conduct an adequate investigation. Petitioner includes a list of people and their contact information, but fails to provid any specific information that the witnesses would have testified to. Petitioner does argue that evidence would have shown that his daughter had sex with other men, but does not describe how this would have aided in him and the rape allegations against him.

Petitioner is not entitled to relief on this claim. Unsupported and "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994). Petitioner includes no specific facts and it is difficult to discern much of his argument. It is well established that a petitioner's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). Without a witness declaration showing that the witness would have provided helpful testimony to the defense, petitioner cannot establish that there is a reasonable probability that the verdict would have been more favorable to him. See Matylinsky v. Budge, 577 F.3d 1083, 1096-97 (9th Cir. 2009); Bragg, 242 F.3d at 1088. Petitioner has failed to demonstrate that the state court denial of this claim was an unreasonable application of Strickland.

Petitioner also argues that trial counsel allowed the prosecution witnesses to lie during trial. In addition to petitioner not offering any evidence that the witnesses lied, trial counsel thoroughly cross examined the prosecution witnesses. RT, Vol. 2 at 78-85, 91-95 RT, Vol. 3 at 312-13, 323-33, Vol. 4 at 647-50, RT, Vol. 7 at 1148-50, 1154-57. This claim is far too speculative to warrant relief and is denied.

5. <u>Sufficiency of the Evidence and Prosecutor Misconduct</u>[3]

Petitioner argues that the evidence was insufficient to support the convictions and the prosecution presented false and perjured testimony.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, <u>see</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief. <u>See</u> <u>id.</u> at 324.

The Supreme Court has emphasized that "<u>Jackson</u> claims face a high bar in federal habeas proceedings . . ." <u>Coleman v. Johnson</u>, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of <u>Jackson</u> when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Payne</u>, 982 F.2d at 338 (quoting <u>Jackson</u>, 443 U.S. at 319).

---

[3] While respondent also argues that the final three claims are procedurally defaulted, the court will look to the merits to deny them. <u>See</u> <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525 (1997) (a district court may address the merits without reaching procedural default issues in the interests of judicial economy).

16

Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

Petitioner presents many arguments that the witnesses' lied, but provides no evidence in support. In this case the jury heard the victim's testimony describing what happened as well as petitioner's testimony regarding the allegations. The jury also heard petitioner's testimony that the prosecution witnesses were lying. RT, Vol. 7 at 1201, 1218-19, 1230-32, 1238, RT, Vol. 8 at 1334, 1343. That the jury credited the victim's testimony and did not believe petitioner will not lead to habeas relief. In addition to the victim's testimony, there was evidence from the sexual assault examination that according to the prosecution witness resulted from a penetrating injury. While the defense presented an witness to refute this testimony, it was within the jury's discretion to believe the prosecution testimony.

After reviewing victim's testimony and the supporting witness testimony and evidence in a light most favorable to the prosecution, it is clear that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Petitioner's disagreement with the evidence and unsupported allegations that witnesses lied is insufficient to provide relief.

Nor has petitioner shown any misconduct by the prosecution. When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, it has been consistently held that such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury. See United States v. Agurs, 427 U.S. 97, 103 (1976). As described above, petitioner has no support for his arguments that witnesses lied and the prosecution was aware or supported it. His mere conclusions are

insufficient. To the extent petitioner argues he is actually innocent, his unsupported allegations fail to meet the high threshold for such a claim, assuming a freestanding actual innocence claim is even cognizable.[4]

### 6. Police Officer Misconduct.

Petitioner argues that the police officers investigating the case falsified evidence and asked him questions despite his request for an attorney. Petitioner offers no evidence to support his allegations of falsified evidence, merely his opinion that the victim and police lied regarding the allegations. As stated above, these conclusory allegations with no support do not warrant habeas relief. James, 24 F.3d at 26. With respect to statements made by petitioner to police, there was no motion to suppress as the prosecution case in chief did not include petitioner's statements. However, after petitioner testified in his own defense, the prosecution asked him if he stated to police, "I don't know if I had sex with [the victim]." RT, Vol. 8 at 1358-60. Even assuming that there was a violation of Miranda v. Arizona, 384 U.S. 436 (1966), the prosecution was allowed to impeach petitioner with his statement. See Harris v. New York, 401 U.S. 222, 225-26 (1971) (prosecutors may impeach defendants with incriminating and voluntary statements even if obtained in violation of Miranda ). Petitioner is not entitled to relief on this unsupported claim.

---

[4] The United States Supreme Court has never held that a freestanding claim of actual innocence is cognizable on federal habeas review. Herrera v. Collins, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); see also House v. Bell, 547 U.S. 518, 554–55 (2006) (declining "to answer the question left open in Herrera " of whether "freestanding innocence claims are possible").

   7.  Witness Lied and Coached the Victim

  Similar to his other claims, petitioner argues that a witness, M.W., lied and coached the victim on how to testify. M.W., was petitioner's former girlfriend and petitioner argues that she was jealous that they were no longer in a relationship. Other than stating his beliefs that this witness lied and incited other witnesses to lie, petitioner offers no evidence or declarations in support. Petitioner also testified at trial that the prosecution witnesses, including M.W. were lying, but the jury did not credit his testimony. RT, Vol. 7 at 1201, 1218-19, 1230-32, 1238, RT, Vol. 8 at 1334, 1343. As with the other claims above, petitioner's unsupported allegations will not justify issuance of the writ. This claim is denied.[5]

## CONCLUSION

  1. For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

  2. Petitioner's motion for a court order to obtain transcripts (Docket No. 57) is DENIED.

  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

  The clerk shall enter judgment in favor of respondent and close the file. SO ORDERED.

---

[5] After this case was fully briefed, petitioner filed a motion to be provided with additional transcripts. Docket No. 57. As the case is fully briefed and none of the claims have merit the motion will be denied.

DATED: October 8, 2013

_____
CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.12\Bailey, J.12-1414.hc.ab.wpd

20